883 A.2d 1065 (2005)
380 N.J. Super. 581
STATE of New Jersey, Plaintiff-Respondent,
v.
Rodney BLACK, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 2005.
Decided October 5, 2005.
*1066 Alan D. Bowman, Newark, argued the cause for appellant (Mr. Bowman, of counsel and on the brief; Richard W. Berg, Trenton, on the brief).
William Kyle Meighan, Assistant Prosecutor, argued the cause for respondent (Thomas F. Kelaher, Ocean County Prosecutor, attorney; Samuel Marzarella, Senior Assistant Prosecutor, of counsel; Mr. Meighan, on the brief).
Before Judges CUFF, LINTNER and GILROY.
The opinion of the court was delivered by
CUFF, P.J.A.D.
Following a jury trial, defendant Rodney Black was convicted of the lesser included offense of aggravated manslaughter, contrary to N.J.S.A. 2C:11-4a(1); and endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4a. The victim was defendant's ten-month old daughter. Defendant is serving a thirty-year term of imprisonment *1067 subject to a NERA[1] 85% parole ineligibility term on the manslaughter conviction and a concurrent ten-year term of imprisonment on the endangering conviction. The appropriate fines, penalties and assessments were also imposed.
On appeal, defendant raises the following points:
Point I RECONSTRUCTING OF THE JURY WAS PLAIN ERROR REQUIRING REVERSAL OF THE CONVICTION AND SENTENCE FOR CHILD ENDANGERMENT.
Point II THE TRIAL COURT'S INSTRUCTIONS TO THE JURY ON CHILD ENDANGERMENT CONSTITUTED PLAIN ERROR.
Point III APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN GRANTED AND THE VERDICT RENDERED WAS AGAINST THE WEIGHT OF THE EVIDENCE.
Point [IV] THE PROSECUTOR'S IMPROPER COMMENTS, TOLERATED BY THE COURT, CONSTITUTED MISCONDUCT AND REQUIRES REVERSAL.
Point V DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS.
Point VI THE SENTENCE IMPOSED WAS UNCONSTITUTIONAL, ILLEGAL AND MANIFESTLY EXCESSIVE.
We reverse the endangering the welfare of a child conviction due to the irregularities accompanying the return of the verdict on this charge, and we reverse the aggravated manslaughter conviction and remand for a new trial due to a prejudicial statement in the prosecutor's summation coupled with an impermissible reference to defendant's silence prior to and following his arrest.
In May 2000, defendant was living at the Lakehurst Motel in Manchester Township with his two children, Farod and Ziaya, and the mother of his children, Tasha Cannon. Farod was two years old; Ziaya was ten months old. The family of four resided in a single room with two beds, a closet and a bathroom.
On May 4, 2000, defendant arrived home from work between 4:45 and 5 p.m. Tasha had been in the room all day caring for the children. Defendant washed, prepared something to eat and fell asleep on one of the beds with Farod. Soon thereafter, Tasha fell asleep on the other bed.
Between 8 and 8:30 p.m., Tasha awoke and prepared a bottle of formula for Ziaya. Tasha testified that she observed the child hold the bottle in her hands and drink from it. She appeared to swallow without difficulty. Soon, Tasha decided to go to the nearby Burger King. As she was leaving, Farod followed her and she decided to take him with her. A receipt demonstrates that she purchased food at 8:48 p.m., and she returned to the room ten minutes later.
On her return, defendant told Tasha that they needed to take Ziaya to the hospital because "she felt warm." Tasha observed that the child was unresponsive to touch or voice and was limp. She immediately placed a 9-1-1 call and handed the phone to defendant. Paramedics arrived five minutes later and transported Ziaya to Community Memorial Medical Center.
One hour later, the child was transferred to Monmouth Medical Center where she was placed on life support. A CT scan revealed a fractured skull with brain swelling. She died from traumatic brain injury *1068 leading to brain death on May 6, 2000 at 11:09 a.m.
The trial was dominated by expert testimony concerning the nature, source and manifestation of the injury. Generally, the various medical experts opined that Ziaya suffered a massive blow to the head. There was some dispute about when the child would have become unresponsive.
Dr. Marc Hofley testified that he has seen this type of injury in "motor vehicle accidents of unbelted passengers. And ... a child who fell from ... four or five [stories]." Dr. Hofley further testified that:
You don't see this from a child falling off a bed or off the dresser, or falling down, you know, a simple flight of stairs.
Usually it's other abuse cases, where a child is abused, or in a motor vehicle accident where the child is not strapped into a carseat or seatbelted, hits the windshield or with the interior of the car.
While Dr. Hofley was unable to provide a specific timeframe as to when the injury occurred, he stated that with a skull fracture such as the one sustained by Ziaya, the victim would be unconscious within a few minutes after the injury occurred.
Dr. Hydow Park performed the autopsy on Ziaya and determined the cause of death to be "blunt-force injuries of the head." Dr. Park determined that the blow to the head was "severe" because the "fracture extended practically all around the head" and was not the result of shaken baby syndrome. Dr. Park opined that the force necessary to cause such an injury would be a "very severe blow," and further stated that "I have never seen this extensive skull fracture in a small child." Dr. Park concluded that the manner of death was a homicide.
Dr. Park stated that a child would not receive an injury such as this from falling off a bed, and he has never seen a child sustain such an injury from a household accident. Dr. Park opined that to sustain an injury this severe, "[t]he head was probably moving, head striking [a] relatively flat surface, either furniture or wall, possibly by holding other parts of the body and swinging." Dr. Park believed that following such an injury "the child will lose consciousness immediately, and become limp and no responses."
In addition to Ziaya's head injuries, Dr. Park also found fractured ribs that were in the process of healing. Therefore, he concluded that they occurred sometime before the head injury. Dr. Park did not believe that the rib fractures were connected with the skull fractures.
Dr. Lucy Rorke, a neuropathologist who examined Ziaya's brain and eyes following the autopsy, testified that in order to produce a fracture of this kind in a baby's skull, "one would have to exert phenomenal force." Dr. Rorke found injury to parts of the brain due to "angular acceleration" or a rotational rather than a linear force. She further testified that loss of consciousness would be immediate and "respiratory difficulties would ensue shortly thereafter." Dr. Rorke defined "shortly thereafter" as probably less than three minutes.
Dr. Rorke also agreed that this type of injury could be caused by swinging a child and the head striking an object, and that this could not have been caused by an accidental fall off a bed. She additionally opined that a child could not crawl or hold a bottle following such an injury.
Defendant presented Dr. John Adams as a medical expert at trial. He based his conclusions on his examination of police reports, the autopsy report, photographs, microscopic slides, DYFS records, scene *1069 photographs, statements of Tasha Cannon, Michael MacDonald, Frankie Sevrinson, Ziaya's medical records, ambulance records and the medical examiner's investigative report.
Dr. Adams opined that the cause of death was a severe head injury caused by blunt force trauma. He agreed that this is not the type of injury that could be sustained by falling off a bed or by bumping her head in a motel room. Dr. Adams testified that he believed that respiratory arrest could occur immediately after the injury up until two hours following the injury. Dr. Adams further testified that respiratory distress would occur "[w]ithin a few minutes of the onset of the injury" to the pons. Dr. Adams opined that the injury to the pons was a secondary rather than a primary injury.
Defendant also testified at trial. He stated that he arrived at the motel between 4:45 and 5 p.m. When he arrived, Ziaya was lying in the bed, Farod was running around and Tasha was sitting on the bed watching television. Ziaya was teething and feverish that day so he asked Tasha how the child was feeling. After he washed and changed his clothes, he played with Farod, ate, and took a nap. When he went to sleep, Tasha and Ziaya were awake and on the neighboring bed. When he awoke, he noticed that Ziaya was asleep at her mother's side.
According to defendant, Tasha decided to go to Burger King and took Farod with her. Tasha prepared a bottle for Ziaya before she left, but he did not see her give the bottle to the child. A few minutes after Tasha left the room, defendant saw the child "bring up formula." He picked her up, placed her on his knee, and she threw up more formula. He held her, rubbed her head and noticed that she was sweaty. He thought the fever associated with her teething was the cause of the child's condition. He returned her to the bed and changed his clothes in anticipation of a trip to the hospital.
When Tasha returned, he met her and told her they should take Ziaya to the hospital. Tasha went into the room. A minute later, defendant entered the room and observed Tasha holding the unresponsive child. He lifted her eyelids and "she had a straight stare in her eye." Tasha placed a 9-1-1 call and defendant spoke to the operator. Acting on the operator's instructions, he observed the child's breathing and felt her heartbeat. He testified that "her chest was moving up and down, but it was slight. She was breathing, but slight." He denied doing anything to the child except to pick her up when she started to spit up formula.
Defendant was charged with knowing or purposeful murder, contrary to N.J.S.A. 2C:11-3a(1) or (2); and second degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4a. The first trial on these charges commenced on July 29 and ended on August 9, 2002, when the jury was unable to reach a verdict and a mistrial was declared. On January 16, 2003, a jury returned a verdict of not guilty to knowing or purposeful murder but guilty of the lesser included offense of aggravated manslaughter. The jury was dismissed and excused from further service.
On January 17, 2003, the trial judge reconstituted the jury and accepted a verdict of guilty to the remaining count  endangering the welfare of a child. At oral argument, we were informed that the jury had not placed any mark on the verdict sheet regarding the endangering charge when it returned its verdict on the murder charge. On appeal, defendant urges that the trial judge could not reconstitute the jury and that the endangering conviction must be reversed. The *1070 State agrees that the trial judge erred but urges us to remand the charge for a new trial. We hold that the conviction of endangering the welfare of a child must be reversed, and the matter should not be remanded for a new trial.
Once a jury has been discharged and dispersed, it cannot be reassembled in order to correct an omission in the verdict, including the failure to announce a portion of the verdict agreed upon but not reported. State v. Fungone, 134 N.J.Super. 531, 342 A.2d 236 (App.Div.1975), certif. denied, 70 N.J. 526, 361 A.2d 540 (1976). See also Mohan v. Exxon Corp., 307 N.J.Super. 516, 524, 704 A.2d 1348 (App.Div.1998); Pressler, Current N.J. Court Rules, comment on R. 1:8-9 (2006).
In Fungone, defendant was charged with larceny, a charge that required the jury to find that the value of the item taken by defendant exceeded $500. Fungone, supra, 134 N.J.Super. at 533, 342 A.2d 236. The trial judge instructed the jury to make a finding as to the value of the item. Ibid. When the jury announced its verdict, it did not report a finding with regard to value and the judge did not ask. Ibid. The judge discharged the jury before he realized that the jury had not returned a finding on the value of the stolen vehicle. Ibid. The judge reconvened the jury the following morning, obtained the requisite response and entered a guilty verdict to larceny as a high misdemeanor. Id. at 533-34, 342 A.2d 236.
We held that the trial judge erred when he reassembled the discharged jury the following day. We stated:
The essential factor in determining whether a discharged jury can be reassembled in order to further deliberate or report on a verdict already reached is whether it has dispersed, left the jury box or courtroom, and had an opportunity to mingle with court attendants, other jurors, or third persons. The fact that the court has announced the jury's discharge will not foreclose subsequent proceedings by the jury, if its members have remained in the jury box or otherwise within the continuous control of the court.
[Id. at 535, 342 A.2d 236 (citation omitted).]
Accord, Mohan, supra, 307 N.J.Super. at 522-23, 704 A.2d 1348.
Here, the State concedes that the jury had not only been discharged, but also dispersed and subject to third-party influences. Therefore, the trial judge should not have reassembled the jury and obtained a verdict on the endangering count the following day. The State contends that the matter should be remanded for a new trial on this issue. We disagree.
In Fungone, this court determined that defendant was not entitled to a new trial on the charge. Rather, we exercised our original jurisdiction to enter a judgment of conviction to the offense of larceny of an item with a value less than $500 consistent with the verdict returned by the jury. Fungone, supra, 134 N.J.Super. at 536, 342 A.2d 236. In doing so, we noted that to reverse and remand for a new trial "would impugn the unanimous verdict reached without any just cause to do so." Ibid. (citation omitted).
Here, unlike Fungone, no verdict was returned on one of the charges. Nevertheless, Fungone is still instructive. Faced with a partial verdict, we determined that in a criminal case it was appropriate to give effect only to the verdict returned by the jury before it was discharged and dispersed. In Mohan, a civil case, we ordered a new trial on the issues subject to the ultra vires deliberations of a recalled jury following discharge and dispersal. *1071 Mohan, supra, 307 N.J.Super. at 524, 704 A.2d 1348.
As recognized in Mohan, the rule concerning the reconvening of a discharged and dispersed jury is similar in criminal and civil cases, but the remedy may differ. We conclude that in a criminal case it is appropriate to only give effect to the verdict returned by the jury before it was discharged and dispersed. To do otherwise, may well transgress defendant's protection against double jeopardy. See Love v. Morton, 112 F.3d 131, 139 (3d Cir.1997) (a precipitously declared mistrial by the trial judge barred re-trial). Therefore, the endangering the welfare of a child conviction is reversed, and we do not remand for a new trial on this charge.
Defendant also argues that his motion for a judgment of acquittal should have been granted and that the verdict is against the weight of the evidence. These arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). If the jury accepted the testimony of the medical experts presented by the State and found the testimony of Tasha credible, there was sufficient evidence to support the verdict. Furthermore, consistent with the test articulated by State v. Reyes, 50 N.J. 454, 458, 236 A.2d 385 (1967), the trial judge properly denied the motion for a judgment of acquittal. This is not to say, however, that the evidence of defendant's guilt was overwhelming. Indeed, the fact that the first jury was unable to reach a decision on the charges demonstrates that this must be considered a close case. It is in this context that we address defendant's contention that the prosecutor's summation was inflammatory and that he impermissibly commented on defendant's pre- and post-arrest silence.
Throughout his summation, the prosecutor referred to the testimony of the various doctors. He stated several times that no one, other than the person who harmed Ziaya, knew how her skull had been fractured. Then, the prosecutor stated, "[t]he only person in this courtroom who could tell us exactly how little Ziaya was murdered is this man sitting right here [indicating the defendant]." When he recounted the 9-1-1 call, the prosecutor stated that defendant never provided any information about the cause of the injury to the dispatcher or emergency personnel. He said, "[t]he defendant never provides any insight into what happened." Then at the conclusion of his summation, the prosecutor stated:
Little Ziaya has been silenced in this world forever. But she testified to us through those doctors. Even in death, that little girl cannot rest. Doctors had to cut her body open, they had to take out her brain and her eyes. And in her little body, they were able to determine the awful truth. And the awful truth is that her father murdered her.
Let Ziaya rest now. Hear her voice through those doctors. The evidence the State has put forth is powerful. I submit to you it more than supports the State's burden and is more than sufficient to convict the defendant.
Ladies and gentlemen, I ask you, then, on behalf of the people of the State of New Jersey, and ask you on behalf of Ziaya, give her the justice she so much deserves, and convict the defendant of murder.
Defense counsel made several objections to the prosecutor's remarks but did not object to the remarks highlighted here and cited as error in this appeal. Therefore, we review the summation by the plain error standard. R. 2:10-2. That is, the error must be clearly capable of producing *1072 an unjust result. State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971).
The prosecutor's statement that defendant never provided insight into the circumstances of Ziaya's injury is problematical on several bases. The statement could be related only to the information provided to the 9-1-1 dispatcher. The jury, however, could also interpret the remark to encompass defendant's failure at that time or at any time up to and including his trial testimony, to provide an account of the circumstances of the child's injury. This comment compromised defendant's right to remain silent. It also had the capacity to transfer the burden of proof from the State to defendant.
In State v. Deatore, 70 N.J. 100, 108-09, 358 A.2d 163 (1976), the Court declared that a defendant who provides exculpatory testimony at trial may not be cross-examined on his failure to advance his exculpatory version of events at or near the time of arrest, whether or not he was subject to questioning. The Court said:
The practical effect of the privilege to remain silent is, as we held a decade ago, "that when a defendant expressly refused to answer no inference can be drawn against him under the doctrine of acquiescence by silence or any other concept," State v. Ripa, 45 N.J. [199], 204 [212 A.2d 22 (1965)], and no comment thereon may be made to the jury, State v. Lanzo, 44 N.J. 560, 563, 210 A.2d 613 (1965).... This being so, it should certainly follow that a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial and cannot be penalized directly or indirectly if he does not. While the situation in Ripa was that of the State offering evidence of a refusal to answer as substantive proof of guilt[ ] on its own case, we think the result should be no different when it is presented by way of attempted impeachment of a defendant's exculpatory testimony through cross-examination, and we so hold as a matter of state law.
[Id. at 115-16, 358 A.2d 163.]
See also State v. Muhammad, 182 N.J. 551, 569, 868 A.2d 302 (2005) (emphasizing that the State may not comment on a defendant's silence at or near the time of arrest). The State is also prohibited from commenting on a defendant's silence in the course of its summation. Lanzo, supra, 44 N.J. at 563, 210 A.2d 613.
Here, the prosecutor's statement referred not only to defendant's silence from the time he summoned assistance but also encompassed the entire period until he testified at trial. The State urges that it did not contravene defendant's right to remain silent because he testified at trial. We note, however, that Deatore testified at trial, State v. Deatore, supra, 70 N.J. at 103-04, 358 A.2d 163, and having not made a statement at or near the time of arrest which was inconsistent with his trial testimony, the prosecutor was not free to comment on the defendant's silence. Id. at 108, 358 A.2d 163.
The prosecutor's statement that defendant failed to provide any "insight" concerning the circumstances of Ziaya's injury, thus requiring the State to resort to medical experts to attempt to reconstruct the events in the motel room, also had the capacity to shift the burden of proof from the State to defendant.
In State v. Jones, 364 N.J.Super. 376, 836 A.2d 814 (App.Div.2003), we emphasized that the corollary of the assignment in a criminal case of the burden of proof to the State is the absence of any obligation by the defendant to establish his innocence. We said, "It is a basic tenet of *1073 our criminal jurisprudence that a defendant has no obligation to establish his innocence." Id. at 382, 836 A.2d 814. The defendant also has no obligation to provide information to assist the State in its prosecution of him.
We must also be mindful of the effect of a prosecutor's suggestions that the defendant possesses critical information about the offense. The United States Supreme Court has recognized that a prosecutor's improper suggestions and insinuations of defendant's knowledge "carry much weight" with the jury "when they should properly carry none." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935). The prosecutor does not represent an ordinary party, rather, he represents the State. Because of its awareness that the prosecutor's goal is to see justice served, the jury may place undue confidence in the prosecutor's words. Ibid.
It is also improper to construct a summation that appeals to the emotions and sympathy of the jury. A prosecutor is entitled and expected to sum up the State's case forcefully. State v. Frost, 158 N.J. 76, 82, 727 A.2d 1 (1999); State v. Harris, 141 N.J. 525, 559, 662 A.2d 333 (1995). The prosecutor is not entitled, however, to play on the emotions of the jury. State v. Martini, 131 N.J. 176, 247, 619 A.2d 1208 (1993). Emotional appeals have the capacity to shift the jury's attention from the evidence and produce a verdict fueled by emotion rather than a dispassionate analysis of the evidence. Ibid. References to the extraction of the child's organs during an autopsy are inflammatory and should be avoided. State v. Timmendequas, 161 N.J. 515, 581, 737 A.2d 55 (1999), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151 L.Ed.2d 89 (2001).
This was a close case. The first jury that heard the evidence was unable to reach a verdict. The State's case was based almost entirely on medical testimony. It was also a case that by its nature had the capacity to excite the emotions of a jury. Every child is precious. Every child has the right to live without physical abuse. Therefore, referring to the manner in which Dr. Rorke obtained the organs for her examination in such graphic terms and making that statement at the very conclusion of the summation had the clear capacity to appeal to emotion rather than to reason.
These comments cannot be considered harmless. Defendant's right to remain silent and the requirement that the burden of proof remains with the State throughout the trial are of constitutional dimension. Error affecting a constitutional right is rarely harmless. State v. Bey, 112 N.J. 45, 94-95, 548 A.2d 846 (1988). The critical reference to defendant's failure to presumably provide an inculpatory statement, coupled with an inflammatory conclusion to the summation calculated to appeal to the emotions rather than the reason of the jury, requires a reversal of the aggravated manslaughter conviction and a remand for a new trial.
The conviction on endangering is reversed; the conviction on aggravated manslaughter is reversed and remanded for a new trial.
NOTES
[1] No Early Release Act, N.J.S.A. 2C:43-7.2.