**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4130-18T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHN B. VERNICEK, a/k/a
BROOKS VERNICEK,
JONATHAN BROOKS, and
BROOK VERNICEK,

     Defendant-Appellant.

_____

Submitted December 15, 2020 – Decided January 28, 2021

Before Judges Yannotti and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 17-09-1343.

Carlos Diaz-Cobo, attorney for appellant (Carlos Diaz-Cobo, of counsel and on the brief; Michael J. Cennimo, on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for appellant (Lisa Sarnoff

Gochman, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant John B. Vernicek was convicted of robbery, N.J.S.A. 2C:15-1(a)(1), and theft by unlawful taking, N.J.S.A. 2C:20-3(a), and sentenced to an aggregate eighteen-year extended prison term with an eighty-five percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. He appeals his convictions and sentence, raising the following points for our consideration:

I. THE TRIAL COURT ERRED IN RULING THAT TWO UNRELATED ROBBERIES SHOULD BE TRIED TOGETHER, AND THEREBY PREJUDICED THE DEFENDANT.

II. THE PROSECUTOR'S IMPROPER COMMENTS IN CLOSING ARGUMENT REGARDING THE SURVEILLANCE FOOTAGE AT ISSUE AMOUNTED TO NEW TESTIMONY NOT RAISED BY ANY WITNESS, AND PREJUDICED APPELLANT.

III. CUMULATIVE ERRORS MADE BY THE COURT UNFAIRLY PREJUDICED APPELLANT.

IV. THE VERDICT OF GUILTY REGARDING THE SECOND ROBBERY WAS NOT SUPPORTED BY THE EVIDENCE.

V. THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

We have considered these contentions in light of the record on appeal and the applicable law and affirm defendant's convictions and sentence.

I.

On July 6, 2017, Morgan Bohnert, a cashier at the Long Branch Stop & Shop, was approached by a male customer who pressed his hand against her back and told her to open the register. Bohnert complied and after the customer stole $714.30, she ran toward another group of customers and told them to call the police. The customer fled the store before the police arrived, but the incident was captured on the store's video surveillance system, which was later recovered by Long Branch police.

Bohnert described the customer as a white male, in his mid-30s, approximately six feet tall, with bloodshot, bluish-green eyes, and with a lean, muscular build. She also stated he was wearing a black sweatshirt and had black and blue gloves with nonslip grips.

Three days later, Donald Milford was visiting his friend David Sears at his apartment in Long Branch. At some point that evening, defendant, who was Sears's neighbor, asked Milford to drive him to a store so he could purchase cigarettes. Milford agreed and drove defendant to Falvo's Liquors (Falvo's) in

3

Long Branch, in his white 1994 Chevrolet van. At approximately 9:00 p.m., Milford parked his van across the street from Falvo's by Pick's Deli (Pick's). Defendant exited the van, put on gloves, and entered the liquor store.

A few minutes later defendant ran back to Milford's van and told him that Falvo's did not have any cigarettes. Milford stated he was unable to see what had occurred in the liquor store. Milford then drove defendant to a 7-Eleven where defendant's image was captured on the 7-Eleven video surveillance.

Dharti Patel (Patel) was the only employee inside Falvo's that evening. She stated that between 9:20 p.m. and 9:30 p.m., a white male entered the store and waved at her as she was collecting money from the cash register. While the register was open, he pushed her to the ground, took $4,000 to $5,000 and fled.

Patel called the police and provided a description that the assailant was a white male wearing gloves, a navy hat, and dark clothing. She noted that he had a lean body type and was anywhere between five and six feet tall. At trial, Patel further noted that his gloves had a "criss-cross, mesh type of shiny black material." The robbery was also captured on Falvo's security cameras.

On July 10, 2017, Detective Joseph Spitale of the Long Branch Police Department (LBPD) reviewed the July 9, 2017 security footage from Falvo's and Pick's. Detective Spitale noted that when he viewed the Pick's security

footage, he "observed an individual leave in a late model white work van parked at [the] deli, and then cross over the street to Falvo's . . . enter the liquor store, and then come back to the van." Detective Spitale also observed from the Falvo's security footage that the assailant was "approximately . . . six feet tall [with a] muscular build" and a "chest tattoo." Detective Spitale took a screen shot of the white van and circulated it to local patrol units.

The police pulled Milford over shortly thereafter while he was driving to work. Milford agreed to speak with Detective Spitale at the police station where he admitted to driving defendant to Falvo's on July 9, 2017 to purchase cigarettes. Milford described the defendant as bald and tall with tattoos on his arms, back, and chest. Detective Spitale stated that because he was familiar with Sears's appearance, he knew that Sears did not fit the description Milford provided. Detective Spitale obtained a Division of Motor Vehicles (DMV) printout of defendant's driver's license photograph and showed it to Milford. Milford positively identified the person in the photograph as the defendant.

After Milford provided his statement to Detective Spitale, he asked if he could retrieve his wallet and paperwork from his van. As Milford searched the van, he found a pair of gloves and immediately stated "[t]hose . . . aren't mine."

Detective Spitale removed the gloves from the vehicle and noted that they matched the description provided by Patel.

That same day, Officer Brian Oliveira of the LBPD displayed a photo array to Bohnert who chose defendant's photograph and stated she was "[ninety-five] percent positive" that he was the person who robbed the Stop & Shop. Defendant was arrested later that evening.

At the time of his arrest, defendant was recorded as six foot one inches tall, 190 pounds, and bald with brown eyes. The police also took photographs of defendant's multiple tattoos. Detective Spitale further noted that it appeared defendant walked with a "slight limp" as if his right leg was "pigeon-toed."

Detective Spitale received consent from Milford to conduct a search of his van where he discovered a blue sweatshirt. The previously recovered gloves and sweatshirt were then sent to the New Jersey State Police (NJSP) Laboratory for DNA testing. A court ordered buccal swab of the defendant was taken and also sent to the lab to be tested.

Jennifer Banaag (Banaag), a forensic scientist for the NJSP Laboratory compared the DNA evidence obtained from the buccal swab with the DNA obtained from the right glove, left glove, and blue sweatshirt. Banaag determined that the right glove contained a "mixture of DNA profiles consistent

with at least two contributors" and that "[t]he DNA profile of [defendant] matches the major DNA profile obtained."

Defendant was charged under Indictment No. 17-09-1343 with second-degree robbery of Patel, N.J.S.A. 2C:15-1(a)(1) (count one); third-degree theft of movable property, N.J.S.A. 2C:20-3(a) (count two); second-degree robbery of Bohnert, N.J.S.A. 2C:15-1(a)(2) (count three); third-degree theft of movable property, N.J.S.A. 2C:30-3(a) (count four); and possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1) (count five).[1]

Defendant moved to sever the robbery and theft charges related to the Falvo's and Stop & Shop incidents arguing that the trial of the offenses together would be unduly prejudicial. After applying the four-part test detailed in State v. Cofield, 127 N.J. 328, 338 (1992), Judge Joseph W. Oxley denied the application in an August 24, 2018 order and accompanying written decision and subsequently denied defendant's motion for reconsideration. At the close of the State's case, defendant made an oral motion for acquittal pursuant to Rule 3:18-1, which the judge also denied.

Defendant was found guilty of counts one and two related to the robbery of Falvo's and acquitted of counts three and four related to the Stop & Shop

---

[1] The State dismissed count five prior to trial.

A-4130-18T1

robbery. Prior to sentencing, defendant moved for a new trial pursuant to Rule 3:20-1, which Judge Oxley denied in a March 28, 2019 opinion and order.

On April 12, 2019, the judge determined that defendant was extended term eligible under N.J.S.A. 2C:43-7.1(b)(1), merged count two into count one, and sentenced defendant to an eighteen-year term of imprisonment. Judge Oxley also concluded that aggravating factors three, N.J.S.A. 2C:44-1(a)(3), ("[t]he risk that the defendant will commit another offense"); six, N.J.S.A. 2C:44-1(a)(6) ("[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted"); and nine, N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring the defendant and others from violating the law") preponderated over the non-existent mitigating factors. This appeal followed.

## II.

In his first point, defendant argues he was prejudiced by the joinder of the charges because the State, in effect, used the evidence of each incident to show defendant had a propensity to commit robbery. We disagree.

Rule 3:7-6 provides that:

> Two or more offenses may be charged in the same indictment or accusation . . . if the offenses charged are of the same or similar character or are based on the same act or transaction or on [two] or more acts or

transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by [Rule] 3:15-2.

Where a defendant "is prejudiced by a . . . joinder of offenses . . . the court may order an election or separate trials of counts . . . or direct other appropriate relief." R. 3:15-2(b). The rule addresses the inherent danger:

> [W]hen several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all.
>
> [State v. Pitts, 116 N.J. 580, 601 (1989) (quoting United States v. Lotsch, 102 F.2d 35, 36 (2d Cir. 1939)).]

In assessing prejudice, the trial court must determine whether the separate crimes charged in the indictment have a sufficient nexus to each other such that they would be otherwise admissible in separate trials pursuant to N.J.R.E. 404(b). State v. Sterling, 215 N.J. 65, 73 (2013). "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

N.J.R.E. 404(b) provides, in relevant part:

9

b) Other Crimes, Wrongs, or Acts.

1) Prohibited Uses. Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.

2) Permitted Uses. This evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

In order to "avoid the over-use of extrinsic evidence," the Supreme Court established the following four-part test in Cofield to determine whether the evidence should be admitted under N.J.R.E. 404(b):

1) The evidence of the other crime must be admissible as relevant to a material issue;

2) It must be similar in kind and reasonably close in time to the offense charged;

3) The evidence of the other crime must be clear and convincing; and

4) The probative value of the evidence must not be outweighed by its apparent prejudice.

[Cofield, 127 N.J. at 338.]

Whether to grant severance "rests within the trial court's sound discretion and is entitled to great deference on appeal." State v. Brown, 118 N.J. 595, 603

10

(1990). The trial court's decision "will be reversed only if it constitutes an abuse of discretion." State v. Weaver, 219 N.J. 131, 149 (2014). We similarly apply a deferential standard of review to a trial court's admission of N.J.R.E. 404(b) evidence when the court considered the Cofield factors. State v. Rose, 206 N.J. 141, 157 (2011).

We conclude Judge Oxley did not err by denying defendant's severance application as the two robberies and related charges were of "similar character" and "part of a common scheme or plan." R. 3:7-6. Here, the assailant in both robberies was a white male with a lean body type who wore dark clothing and gloves. Both robberies were committed in Long Branch less than seventy-two hours apart. Further, the robberies included acts of violence or threats of violence against a female cashier at night.

With respect to Judge Oxley's Cofield analysis, he correctly determined that the evidence of both robberies was relevant to the material issue of identity. On this point defendant concedes that "the identity of the perpetrator(s) of the robberies is of course a material issue . . . ." The judge also noted that the "the evidence found in the second robbery led to the photo lineup where the victim positively identified the [d]efendant as the perpetrator of the first robbery."

Second, Judge Oxley properly determined that both robberies were similar and reasonably close in time. Indeed, as the judge observed, both robberies occurred a few days apart. The judge also found that the robberies were committed in a similar manner as the assailant in both crimes "was wearing dark colored clothing, a baseball hat, and gloves" and "threatened or used force against . . . female employees . . . ."

Third, as Judge Oxley explained, there was "clear and convincing evidence that the robberies happened, and [that] the [d]efendant is the individual that committed the crimes." In support of his decision, the judge noted that "Milford told police that at the time of the robbery, he drove the [d]efendant to Falvo's Liquors to buy cigarettes." Moreover, "[b]ased on [Milford's] identification of the [d]efendant, a photo array was produced to . . . Bohnert . . . [who] picked the [d]efendant as the perpetrator during the photo lineup."

Although we acknowledge that the jury acquitted defendant of counts three and four, there was sufficient evidence that the defendant was likely the perpetrator of the Stop & Shop and Falvo's robberies for the judge to weigh this factor in favor of the State. State v. Koskovich, 168 N.J. 448, 485 (2001) ("The third prong of the Cofield test 'requires some showing that the person against whom the evidence is being used actually committed the other crime or wrong.'"

(quoting State v. G.V., 162 N.J. 252, 275 (2000) (Coleman, J., concurring in part)).

Fourth, the judge properly determined that the probative value of the evidence regarding defendant's identity outweighed any potential prejudice by joinder of the offenses. Further, the jury's action in acquitting the defendant of the Stop & Shop robbery and convicting him of the Falvo's robbery demonstrates that they considered the evidence related to each of the charges separately. See State v. Jackson, 204 N.J. Super. 13, 21 (App. Div. 1983) ("[T]he test of prejudice is 'whether a jury could arrive at a determination on each charge irrespective of the evidence concerning guilt on other charges.'" (quoting State v. Cole, 154 N.J. Super. 138, 143 (App. Div. 1977))).

Finally, Judge Oxley appropriately instructed the jurors they were "prohibited from considering the cumulative impact of the evidence of all the offenses in determining whether a particular charge had been proven." State v. Krivacska, 341 N.J. Super. 1, 43 (App. Div. 2001). The judge's charge also included the following instruction:

> There are four offenses charged in the indictment. They are separate offenses by separate counts in the indictment. In your determination of whether the State has proven the defendant guilty of the crimes charged in the indictment beyond a reasonable doubt, the defendant is entitled to have each count considered

separately by the evidence which is relevant and material to that particular charge based on the law as I will give it to you.

We have no reason to doubt that the jury heeded these instructions. See State v. Loftin, 146 N.J. 295, 390 (1996) ("That the jury will follow the instructions given is presumed."). In sum, we conclude that Judge Oxley did not abuse his wide discretion by deciding to try the robbery and related charges together, see Weaver, 219 N.J. at 149, and in applying the Cofield test.

III.

Defendant argues in his second point that his convictions should be reversed because of prejudicial comments made by the prosecutor during closing arguments. He specifically contends the prosecutor improperly "interjected facts" that were not in evidence regarding: 1) unique characteristics of defendant's leg; 2) defendant's tattoos; 3) a white button on the shorts defendant allegedly wore on July 9, 2017; and 4) Bohnert's level of confidence in her identification of defendant. Defendant also argues that the prosecutor's comments about "his own family and his aspirations to meet the [British] [r]oyal family" were irrelevant and improper emotional pleas. Finally, defendant maintains that the judge erroneously failed to provide the jurors with a magnifying glass despite their request.

14

"[P]rosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive [the] defendant of a fair trial." State v. Timmendequas, 161 N.J. 515, 575 (1999) (citing State v. Chew, 150 N.J. 30, 84 (1997)). "To justify reversal, the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense." Ibid.

Prosecutors are afforded "considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Id. at 587. "Although prosecutors may suggest legitimate inferences from the record, they may not go beyond the facts before the jury." State v. Roach, 146 N.J. 208, 219 (1996). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." State v. Frost, 158 N.J. 76, 83 (1999). "The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." Ibid. Here, defendant failed to object to any of the prosecutor's comments made during closing argument.

Here, the prosecutor stated that "[Detective] Spitale talk[ed] about [defendant's] foot, [that he] puts his foot in sometimes." The prosecutor further

stated that "in that video when [defendant] first walked in the store, you saw the little minor foot thing. Something else he does, too, every once in a while. Is the best way to describe it is a leg kick-out . . . . And you saw when he first walked in to 7-Eleven, he does that leg kickout."

The prosecutor also commented that "[s]hockingly, the guy who committed the robbery also has a large tattoo on his chest" and that in the defendant's arrest photo "you see the [chest] tattoo." Moreover, the prosecutor stated that "at one point [defendant] turns when he's at 7-Eleven and you see the button, the button on his shorts are white."

Defendant claims it was improper for the prosecutor to note that defendant appeared to "kick-out" his leg on the Stop & Shop and 7-Eleven surveillance footage. He argues that "no witness had previously testified as to any notable leg movement or abnormal limp appearing at the time of the Stop & Shop robbery or on the video of the Stop & Shop robbery."

The judge properly rejected this argument in his March 28, 2019 order and opinion denying defendant's motion for new trial. The judge specifically noted that "[t]he jury heard testimony from multiple witnesses and reviewed surveillance video from various locations that supported the prosecutor's comments." Further, as defendant concedes in his merits brief, Detective Spitale

16

testified that he witnessed the defendant walk with a "slight limp" as if he were "pigeon-toed."

Likewise, the record provided testimony regarding defendant's tattoos to support the prosecutor's comments. Indeed, Milford testified that defendant had a tattoo on his chest and arm. Further, Detective Spitale testified that he observed a chest tattoo on the assailant in the Falvo's surveillance footage and that he was able to confirm that defendant had a chest tattoo from his DMV photo.

Defendant next maintains that the prosecutor improperly stated that there was a white button on his shorts in the 7-Eleven surveillance footage. This comment was made in direct response to defense counsel's argument in closing that defendant was "not wearing what was used by the individual who went into Falvo's." We are unable to confirm if the video surveillance footage depicted defendant's shorts with or without a white button as the parties have not provided a copy for our review. However, even if we were to assume that the video did not depict a white button, when viewed in light of all the overwhelming evidence of defendant's identity and guilt, we find that the prosecutor's comments did not deprive the defendant of a fair trial. Timmendequas, 161 N.J. at 575.

Defendant further argues that the prosecutor improperly "testified" about Bohnert's level of confidence in her identification of the defendant. Specifically, defendant contends that the prosecutor's statement that if "[Bohnert] saw that picture that day of the [defendant's] entire body, she would have been 100 percent sure" was not a fact in evidence. Defendant is incorrect. At trial, when asked by the State "if you saw the person's entire body . . . would that help you get to 100 percent," Bohnert answered "[y]es." Accordingly, the prosecutor simply emphasized testimony that was provided by Bohnert.

Defendant also contends that the prosecutor's comments regarding his family and "aspirations to meet the [British] [r]oyal [f]amily" were so "irrelevant," and that their only purpose was to "improperly appeal to the emotions of the jury." It is well settled that it is "improper to construct a summation that appeals to the emotions and sympathy of the jury." State v. Black, 380 N.J. Super. 581, 594 (App. Div. 2005). Indeed "[e]motional appeals have the capacity to shift the jury's attention from the evidence and produce a verdict fueled by emotion rather than a dispassionate analysis of the evidence." Ibid.

Here, the prosecutor referenced physical habits of both himself and a member of the British royal family in prelude to the discussion of defendant's

leg "kick out." Specifically, the prosecutor stated that Prince Harry "does this thing . . . he sticks his hand [in his jacket]." The prosecutor further noted that he makes a "silly face" in photos that his wife always points out. After a review of the record we are satisfied that there is nothing to indicate these comments "shift[ed] the jury's attention from the evidence." Ibid. Indeed, it was merely a strategy used by the prosecutor to explain evidence presented at trial. Even if inappropriate, we are satisfied that those limited comments did not deny defendant his right to a fair trial. Timmendequas, 161 N.J. at 575.

Finally, defendant asserts for the first time on appeal, that reversal is necessary because the judge should have granted the jury's request for a magnifying glass to examine photos in evidence. Specifically, defendant asserts that "the denial of the reasonable request constituted another ground of error." Defendant, however, misconstrues the record. The judge did not deny the jury's request for a magnifying glass, instead, he informed the jury that he "[did] not have a magnifying glass" to give them.

There is no caselaw or statutory authority that holds that a trial court is required to have a magnifying glass readily available or provide a magnifying glass upon request. Moreover, defendant has not provided any support for his position that the unavailability of a magnifying glass produced an unjust result.

R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . .").

## IV.

In defendant's third point he claims that cumulative errors made by the court unfairly prejudiced his right to a fair trial. Specifically, defendant maintains that: 1) the trial court did not properly address defendant's concern of a juror who appeared to be asleep; 2) it was "error for the court to repeatedly allow the State to play the surveillance footage at issue numerous times throughout the trial"; and 3) the court's decision to have the jury foreperson determine when to pause the Stop & Shop video during summation was improper. We are not persuaded by any of these contentions.

During trial, defendant's counsel notified the judge that he observed a juror falling asleep during the testimony of the State's forensic expert. In response, Judge Oxley stated that "[he] did not notice it" but "[he would] continue to monitor it."

Defendant argues that the judge improperly concluded that juror number eight was paying attention. He further argues that Judge Oxley failed to conduct an inquiry into the juror's attentiveness pursuant to State v. Mohammed, 226

N.J. 71 (2016).  In <u>Mohammed</u>, the Supreme Court provided guidance for trial judges who are faced with a juror who is asleep or inattentive.  Specifically, the court stated that:

> When it is alleged that a juror was inattentive during a consequential part of the trial, if the trial court concludes, based upon personal observations explained adequately on the record, that the juror was alert, the inquiry ends.  If the judge did not observe the juror's attentiveness, the judge must conduct individual voir dire of the juror; if that voir dire leads to any conclusion other than that the juror was attentive and alert, the judge must take appropriate corrective action.

> [<u>Id.</u> at 75.]

Here, the judge fully complied with the holding in <u>Mohammed</u>.  Indeed, Judge Oxley concluded "based upon personal observations explained adequately on the record" that juror number eight was "very alert."  <u>Ibid.</u>  Judge Oxley further explicitly stated that he had been "watching [the juror] carefully" and noted that the she seemed "attentive and [was] certainly . . . paying attention . . . [with] everything that's going on in the court."  The judge also noted that he "had been watching juror number eight throughout the afternoon" and did "not see her eyes close once."  Moreover, the judge stated that the juror was "bright" and attentive."  Accordingly, an individual voir dire of the juror was not necessary, and we discern no error in Judge Oxley's actions.  <u>Ibid.</u>

A-4130-18T1

Defendant next argues that "it was error for the court to repeatedly allow the State to play the surveillance footage at issue numerous times throughout the trial." Specifically, the defendant maintains that the evidence was "reduplicative" and prejudicial. As best we can discern, defendant's argument is grounded in N.J.R.E. 403.

On appeal, however, defendant does not provide any explanation as to how the duplicative evidence prejudiced him. The video surveillance footage afforded the jury the opportunity to see the Falvo's robbery as it occurred. Indeed, by replaying the video, the State was able to provide a complete timeline of the events as they transpired on July 9, 2017, from the moment the robbery took place, to defendant's departure from the 7-Eleven. Moreover, this timeline corroborated Milford's testimony that he had driven defendant to the 7-Eleven after he was allegedly unable to purchase cigarettes from Falvo's. Accordingly, the video surveillance footage was probative to defendant's guilt related to the Falvo's robbery. It was not unduly prejudicial and its admission was not an abuse of discretion. State v. McGuire, 419 N.J. Super. 88, 135 (App. Div. 2011).

Relying on State v. A.R., 213 N.J. 542 (2013), and State v. Miller, 205 N.J. 109 (2011), defendant next argues that the trial court erred in allowing the jury to pause "the playback of the surveillance footage related to the Stop [&]

Shop incident" during jury deliberations. Neither case, however, supports defendant's argument.

In both A.R. and Miller, the Supreme Court addressed whether a jury is permitted to review videotaped witness statements during deliberations, not crime scene surveillance footage. Miller, 205 N.J. at 121 (holding that a jury during deliberations can review digital video of a witnesses' testimony when there was no court reporter to transcribe it); A.R. 213 N.J. at 558-59 (holding that the jury's review of a victim's video-recorded statements did not implicate defendant's "right to confront evidence or witnesses against him or to assure a fair trial process"). In contrast here, the jury requested, and reviewed, video surveillance footage obtained from the scene of the Stop & Shop robbery that was admitted into evidence. Accordingly, Judge Oxley did not abuse his discretion in allowing the jury to review an exhibit admitted into evidence. McGuire, 419 N.J. Super. at 135; see also Green v. New Jersey Mfrs. Ins., 160 N.J. 480, 492 (1999) ("Determinations pursuant to N.J.R.E. 403 should not be overturned on appeal 'unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide off the mark that a manifest denial of justice resulted.'" (quoting State v. Carter, 91 N.J. 86, 106 (1982))).

23

Defendant, for the first time on appeal, argues that the court erred in its decision to "allow the foreperson of the jury (alone) to say when the video at issue should be paused." Specifically, defendant suggests, without reference to any authority, that the "better practice would have been for the entire jury to confer and request 'time stamp' of the footage." Defendant, however, does not provide any support for the position that Judge Oxley's decision to have the jury foreperson choose when to pause the Stop & Shop video produced an unjust result. R. 2:10-2.

When multiple errors are alleged, "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." State v. Wakefield, 190 N.J. 397, 538 (2007). However, even where a defendant alleges multiple errors, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." Weaver, 219 N.J. at 155. Given our conclusion that there were no trial errors, there can be no cumulative errors as contended in Point III that could have denied defendant a fair trial.

V.

Defendant argues in his fourth point that the court erred in denying his motion to dismiss the robbery charge at the close of the State's case and his

application for a judgment of acquittal after the jury verdict claiming that his conviction of the Falvo's robbery "was not supported by the evidence." Defendant further maintains that "even if all the reasonable inferences based upon the credible evidence are granted to the State, his [robbery] conviction . . . cannot be upheld as a matter of law."  Again, we disagree.

Rule 3:18-2 provides that "[i]f the jury returns a verdict of guilty . . . a motion for judgment of acquittal may be made, . . . [and] [t]he court on such motion may set aside a verdict of guilty and order the entry of a judgment of acquittal . . . ."  A court applies the same standard when deciding a motion for a judgment of acquittal under Rule 3:18-1 (a motion made before submission to a jury) or Rule 3:18-2.  State v. Papasavvas, 170 N.J. 462, 521 (2002).  The test is "whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014).  "Under both Rules 3:18-1 and -2, the court 'is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.'" Papasavvas, 170 N.J. at 521 (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)).

"An appellate court will apply the same standard as the trial court to decide if a judgment of acquittal was warranted." State v. Felsen, 383 N.J. Super. 154, 159 (App. Div. 2006) (citing State v. Moffa, 42 N.J. 258, 263 (1964)). To assess the sufficiency of evidence on an acquittal motion, an appellate court applies a de novo standard of review. Williams, 218 N.J. at 593-94.

"[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000). In considering whether a guilty verdict was against the weight of the evidence produced at trial under Rule 3:20-1, "our task is to decide whether 'it clearly appears that there was a miscarriage of justice under the law.'" State v. Smith, 262 N.J. Super. 487, 512 (App. Div. 1993) (quoting R. 2:10-1). "We must sift through the evidence 'to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present." Ibid. (quoting Carter, 91 N.J. at 96). Our "objective is not to second-guess the jury but to correct the injustice that would result from an obvious jury error." State v. Saunders, 302 N.J. Super. 509, 524 (App. Div.

1997). We do not evaluate the evidence and determine anew how we might have decided the issues.

Here, the judge's decision both to deny the motion for acquittal and the motion for a new trial was supported by the record and aforementioned precedent and is therefore unassailable. Indeed, at trial, Milford testified that he had driven defendant to Falvo's on July 9, 2017 at approximately 9:00 p.m. in his white van, at the time the robbery occurred. Moreover, surveillance footage from Falvo's and Pick's corroborated Milford's testimony. The Falvo's surveillance footage also showed the perpetrator put on a pair of gloves. Likewise, Patel testified that the assailant wore a pair of gloves with a "crisscross, mesh type of shiny black material." When Milford searched his van in the impound lot, he found a pair of gloves that Detective Spitale stated matched "the description of Ms. Patel." The subsequent DNA test performed on the glove revealed that it contained a "mixture of DNA profiles consistent with at least two contributors" and that "[t]he DNA profile of [defendant] matches the major DNA profile obtained."

Accordingly, Judge Oxley correctly denied defendant's applications, as a reasonable jury could, and did, find defendant guilty beyond a reasonable doubt of robbery and theft by unlawful taking.

In his final point, defendant argues that his eighteen-year sentence was manifestly excessive because it was at the higher end of the permissible range, the court improperly applied the aggravating factors, and the court failed to adequately explain its findings. We disagree.

We employ a deferential standard when reviewing a trial court's sentencing decision. State v. Grate, 220 N.J. 317, 337 (2015); State v. Fuentes, 217 N.J. 57, 70 (2014). We must affirm a sentence unless: 1) the trial court failed to follow the sentencing guidelines; 2) the court's findings of aggravating and mitigating factors were not based on competent and credible evidence in the record; or 3) "'the [court's] application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" Fuentes, 217 N.J. at 70 (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Here, defendant does not contest Judge Oxley's ruling that he was subject to an extended term pursuant to N.J.S.A. 2C:43-7.1(b)(1). As such, on defendant's robbery conviction, he faced a maximum extended term of imprisonment between ten and twenty years. N.J.S.A. 2C:43-7(a)(3). The

judge's decision to sentence defendant to an eighteen-year term of imprisonment was within the sentencing guidelines.

Defendant's challenge to the court's factual findings are without merit. Here, the judge applied aggravating factors three, six, and nine and noted that after "[l]ooking over the balance of the presentence investigation [and] the facts and circumstances of this offense as I find it, I find absolutely no mitigating factors." Moreover, Judge Oxley concluded that "the aggravating factors substantially outweigh[ed] the [non-existent] mitigating factors."

Although the judge's statement of reasons related to its application of the aggravating and mitigating factors could have been more fulsome, a remand is unnecessary when it is "possible in the context of [the] record to extrapolate without great difficulty the [sentencing] court's reasoning." State v. Pillot, 115 N.J. 558, 566 (1989); State v. Bieniek, 200 N.J. 601, 609 (2010). Here, from our review of the record we have no "doubt as to the facts and principles the court considered and how it meant to apply them." Miller, 205 N.J. at 130.

Indeed, it is clear that Judge Oxley was aware of defendant's extensive criminal history from the pre-sentencing report, which listed defendant's seven juvenile court, nine municipal court, and twelve superior court convictions for multiple offenses including parole violations, burglary, aggravated assault, and

29

robbery. In addition, the State argued that defendant's criminal record was indicative of his inability to take responsibility for his actions and illustrated that he is likely to commit a future offense. The State also explained that there was a need to deter defendant and others from committing violent crimes. Based on the record before us, we are able to "extrapolate without great difficulty," the judge's reasoning regarding the application of these aggravating factors and the absence of any mitigating factors. Pillot, 115 N.J. at 566.

In sum, we are convinced that the judge adhered to the sentencing guidelines and the record supports the findings of aggravating factors three, six and nine, and the application of no mitigating factors. The sentence imposed was well within Judge Oxley's sentencing discretion and does not shock our judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4130-18T1