**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3983-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SUK BAN, a/k/a DAEGON
CHUNG, and CHRISTOPHER
BAN,

     Defendant-Appellant.

_____

Submitted January 30, 2024 – Decided March 22, 2024

Before Judges Enright and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 19-10-1134.

Jake Kim Law Firm, LLC, attorney for appellant (Jake S. Kim, on the briefs).

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

Defendant Suk Ban appeals from his August 2, 2022 convictions and sentence following a jury trial. We affirm.

I.

This appeal stems from defendant's involvement in a bar fight during the early morning hours of July 21, 2019. On that date, former high school friends, Se Hyeon Baek and Jin Hyung Park, were socializing separately with friends at Rock 21, a karaoke bar in Palisades Park. The two met up and briefly left the bar to smoke cigarettes together. As they walked outside, they encountered defendant, and two of his friends, Young Min Choi (Choi) and Sung Mo.

Words were exchanged between the two groups of men after defendant bumped into Baek. Baek and Park went back inside the bar but left again minutes later and found defendant and his friends still standing outside the bar.

A verbal dispute ensued between defendant's group and Baek and Park. As Baek was smoking a cigarette, defendant took it away from him and refused to give it back. Defendant then pushed Baek and Choi punched Baek in the face. Defendant also struck Park in the face and head, and Park fell into the street. Choi and defendant repeatedly punched and kicked Park as Park was lying on his back.

2

Because Mo and Baek also began physically fighting with each other, Choi joined their fight, grabbed Baek, and threw him to the ground. At some point during the melee, Park—who remained motionless in the street after defendant and Choi punched and kicked him—was struck by a white SUV. After defendant, Choi, and Mo left the scene, Baek called out Park's name. Park did not answer, and Baek yelled to others for help.

The police arrived at the bar at approximately 2:15 a.m., Park was breathing but remained unresponsive. He had multiple lacerations on his face. An officer from the Palisades Park Police Department used gauze pads and applied pressure to Park's forehead and right eye to stop the bleeding.

Park was transported by ambulance to a local medical center. He remained in the intensive care unit for approximately four weeks and was in a coma for three of those weeks. CAT scans showed he suffered multiple injuries, including a broken bone under his right eye, a nasal bone fracture, a ruptured bladder, and a broken pelvis. Park also sustained a severe orbital floor injury and suffered from double vision. He underwent multiple surgeries, required the use of a catheter, and could not stand or walk for approximately three months.

Detective Frank DeCicco, with the Palisades Park Police Department obtained surveillance video of the incident and subsequently identified

3

defendant and Choi from the footage. In October 2019, a Bergen County grand jury indicted both men, charging them with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count one), and endangering an injured victim, N.J.S.A. 2C:12-1.2 (count two).[1]

Following their indictment, defendant and Choi claimed Baek and Park were the aggressors during the July 21, 2019 incident. Defendant also asserted that after the fight started, Park placed him in a chokehold, prompting defendant to act in self-defense. Accordingly, the co-defendants sought to present a self-defense expert, Mickie McComb, to testify at trial about chokeholds and how to identify indicators of aggression. The State moved to bar McComb's testimony.[2]

The trial court conducted a testimonial hearing in March 2022 to address McComb's proposed testimony. Thereafter, the judge granted the State's motion, explaining:

> There [are] two particular areas that defendant[]
> seek[s] to have . . . McComb testify to. One has to do
> with . . . what a choke[]hold is, [and] the nature of a
> choke[]hold. . . .

---

[1] Choi is not participating in this appeal.

[2] The State also sought to bar testimony from the defense's medical expert, Dr. Franz Yanagawa. The judge denied the motion but limited Dr. Yanagawa's testimony to "opinions within his area of medical expertise."

A-3983-21

. . . .

The second . . . has to do with aggressive behavior that presumably . . . occurred prior to the actual physical interaction between the individuals. . . . The question becomes whether or not th[is] . . . would enhance the knowledge or understanding of the average juror.

[As to t]he indicators of aggression[,] I find that . . . testimony is not such that would be helpful to the average juror. It is not outside the ken of the average individual. Specifically, someone who was pushing off of another person, someone . . . dealing with [a person] who had their fists clenched or was coming towards you would . . . clearly be within the experience of the average juror to be able to identify that as aggressive behavior.

. . . Accordingly, I would not allow the testimony regarding the indicators of aggression. . . . [T]here is a video . . . [that] portrays what transpired between the parties involved.

Regarding McComb's proposed trial testimony about chokeholds, the judge stated:

The . . . problem here is . . . the lethality of the choke[]hold, or the fact . . . one may sustain serious injury from what's . . . referred to as a choke[]hold. . . .

[McComb] discusses use of a potentially life-threatening rear choke[]hold on . . . [defendant] and that [defendant] . . . employed self-defense and escape measures to become released from [the chokehold] . . . . Now, it's important . . . to remember that no one here . . . ha[s] any military experience.

5

Similarly, I have no reason to believe that [Park] has any military or law enforcement experience.

There is no information from which [McComb] can draw the conclusion that this particular event was potentially life-threatening. I believe that is a net opinion. It's unsubstantiated by any other facts. Now, . . . in the self-defense charge, . . . that . . . charge instructs the jury . . . as follows[:] . . . .

"Therefore, you must first determine whether the defendant used deadly force. If you find that the defendant did so, then you must determine if the defendant reasonably believed he or she had to use deadly force to defend against the . . . unlawful conduct of another." Of course, a person may only use deadly force when that force is necessary to prevent the . . . same proportionate force against them. So[,] the proportion of the force being used may be relevant here.

. . . [T]he documenting of a choke[]hold may very well be within . . . McComb's area of expertise. A manner in which to escape a choke[]hold may [also] very well be . . . within his area of expertise. But since no one here is trained on any of these things, arguably, the only portion of the testimony that may be relevant is the potential consequences of compression of an airway or an artery. . . . McComb is not an expert in medical science. That information or testimony may be relevant, but that would require a medical individual to opine regarding the potential consequences of that type of conduct. . . .

. . . .

. . . [McComb] is an expert in authorized use of force. Medical doctors can testify to what can happen if one's artery is . . . compressed or their . . . windpipe

6

A-3983-21

is . . . compressed. I do not find [McComb] to be a medical expert.

. . . .

. . . What is relevant in this matter is whether . . . defendants acted reasonably. . . . [D]eadly force is defined in the jury charge as . . . the [force] defendant uses, with the purpose of causing[,] or which he or she knows to create a substantial risk of causing[,] death or serious bodily harm. . . .

. . . .

. . . [I]n order for a self-defense defense to be successful, the . . . idea that one needs to use a proportionate level of force need only be reasonable. It doesn't need to be right. . . .

. . . McComb's testimony does not enlighten us on what was reasonable in the minds of [defendant] and [co-defendant] Choi. This is not . . . a situation where [a] determination as to whether or not . . . defendant . . . acted reasonably [is] outside the ken of the average juror. This is not a military operation. . . . This was a fight in . . . the street. I am not suggesting th[at] self-defense may not apply. I'm suggesting that . . . McComb's testimony is not outside the average ken of the juror, and I am not going to allow it.

In fact, I believe that it would confuse the issues and mislead the jury [if McComb were to testify] about escape protocols, since none of those things are an issue here. . . . [Thus,] I am prohibiting . . . McComb's testimony in this matter.

7

A-3983-21

In a subsequent hearing, the judge further explained she barred McComb's testimony because it "was not relevant in that [McComb wa]s not an expert in the field that he was speaking about, which was the effects of what he referred to as a chokehold. And . . . therefore, . . . his testimony was not relevant."

Prior to trial, the judge also denied defendant's motion to suppress or limit the use of the surveillance video from the July 21, 2019 incident, even though it included footage of a white SUV running over Park. Additionally, the judge denied defendant's motion to bar certain photographs of Park which showed his condition immediately after the incident. The judge noted that one of the photos depicted Park in a neck collar, making it clear he was "rendered some aid," and another photo showed he had "abrasions and marks" on his legs, while other photos showed the left and right side of his face. She concluded the photos were "not unduly prejudicial," they would not mislead the jury, and should be admitted as they "relate[d] . . . to an ultimate issue in th[e] matter," considering "[t]his [wa]s an assault case." Further, the judge found the photographs were not too numerous or "redundant," and "the jury w[ould] not be misled."

Defendant's jury trial with his co-defendant, Choi, began in March 2022 and ended the next month. The State called several witnesses during the trial, including Baek and Park, as well as the officer who rendered first aid to Park

8

after the incident, and Detective DeCicco, who investigated the incident and secured surveillance video from the bar. Additionally, the State produced two of Park's doctors to testify, Dr. Brian Benson and Dr. Kelley Rippey.

Dr. Benson, an otolaryngologist, testified he evaluated Park at the medical center. He opined Park sustained an orbital floor fracture and a nasal bone fracture. Dr. Benson also concluded the injuries to the right side of Park's face were consistent with "[b]lunt force trauma to the bone." The doctor stated, "[a] classic example" of a cause "for an orbital blowout fracture is . . . having a blow to the eye[ with] a fist or . . . a bat."

Dr. Rippey, an acute care surgeon, testified she treated Park immediately after the incident. When he was brought in by ambulance, she noted he had "extensive facial trauma" and "multiple cuts" on his face, three of which were "very deep." She also testified "[h]is right eye was swollen shut to the point where he could not open it," he "had a bone broken beneath his right eye," "multiple fractures to his pelvis," "a hole in his bladder," "[a] very extensive abrasion to [one of] his thigh[s]," and "both hip sockets were broken." Given his extensive injuries, Dr. Rippey believed Park's "life was in danger" when he arrived at the medical center.

9

On cross-examination, Dr. Rippey was asked how much she was paid to testify. She answered, "I think there's a fee. I don't know what it is and I haven't received anything." She also stated the Prosecutor's Office paid for her to fly from California to New Jersey to testify.

During Baek's testimony, he confirmed he was at Rock 21 on the night of the incident and when he and Park first stepped outside the bar to smoke, defendant bumped into Baek. Baek also remembered that when he and Park left the bar minutes later to smoke again, defendant, Choi and Mo were standing just outside the bar and "all of a sudden the situation deteriorated." Baek testified defendant and his friends quickly instigated a fight and Baek immediately "was on the floor being pummeled, battered, and then [Park] was on the road laying down, bleeding profusely." Baek did not recall the conversation the two groups of men had before the fight started, but thought "curse words [we]re exchanged here and there." Baek also remembered defendant "took away a cigarette that [Baek] was smoking," and Choi "punched [his] face."

On cross-examination, Choi's attorney showed Baek certain video clips from the incident and asked if Baek recalled Park or Choi "being aggressive." Baek stated he did not remember. Choi's attorney then asked if Baek "recall[ed] being angry [him]self at [defendant or Choi] at th[at] point." Baek answered,

10

"I'm sure that [defendant] was not in [a] good mood.  I . . . remember that they were not in [a] good mood."  Defendant's attorney immediately asked for a sidebar, prompting the following exchange:

> [DEFENDANT'S COUNSEL]:  I don't speak Korean, but my understanding is . . . [there was a] problem . . . in translation.  Whe[n] [Baek] first answered . . . "I was angry with them," and [the translators] said [in translation], "No, they were angry with me," [that was] not a good translation and that[ is] not fair.

> THE COURT:  Okay.  The translators who are assigned to us are . . . court interpreters.  They interpret literally, as I understand it, and so, the literal interpretation [is] what goes . . . on the record.  And <u>I understand that that sometimes makes cross[-]examination or even direct examination difficult, but that's what they are charged to do.  So[,] you might need to . . . rephrase your . . . questions</u>. . . .

> [DEFENDANT'S COUNSEL]:  But it changed the entire meaning of his answer.

> THE COURT:  Okay, . . . I understand . . . your client speaks Korean, right?

> . . . .

> [DEFENDANT'S COUNSEL]:  Well—both of them speak Korean, yeah.

> . . . .

> THE COURT:  Okay.

11

[DEFENDANT'S COUNSEL]: —and they're both saying it's not the . . . right translation. . . .

THE COURT: Okay. I, again, have two translators who are certified with the court . . . . I don't know how to correct that, sir.

[DEFENDANT'S COUNSEL]: I don't know how to correct it. I'm with you, I don't know how to correct it either . . . .

THE COURT: Well[,] . . . <u>I understand your clients are complaining about the translation. I don't know that their complaints are accurate</u>, so . . . what I should say is <u>I don't know that it needs correction</u>, but I have two translators who are certified by the courts in the [S]tate of New Jersey to interpret literally the answers, so we[ are] going to continue.

[(Emphasis added).]

Rather than rephrase the question leading to the above exchange, Choi's attorney asked if Baek felt defendant "was[] being aggressive" "at th[at] point" in the video. Baek testified he did not know. As cross-examination continued, Choi's attorney again referred to the same portion of the video, and asked Baek if he recalled "any aggression from . . . Choi." Baek answered, "I don't remember."

Choi's attorney also questioned if Baek and Park "were mad at [defendant's group] still," to which Baek responded, "I mean, just looking at the situation [on the video], the situation doesn't look good." The judge promptly

12

instructed Baek to provide "responses . . . drawn from [his] memory" rather than the video. Choi's attorney then asked Baek, "So[,] at this point[,] you really have no recollections going forward?" Baek responded, "Yes, from this point[,] the only thing I remember is that I was on the ground getting hits."

Park testified after Baek. Much like Baek, Park recalled limited details about the incident. Park testified, he remembered that when he and Baek first met defendant, Choi, and Mo outside the bar, defendant's group "bumped into [Park and Baek]." Park also recalled that shortly after he and Baek returned to the bar, they went outside again "to smoke a cigarette . . . and . . . those same guys were there." Park testified that "all of a sudden[, defendant's group] just attacked" Park and Baek. Park also "remember[ed] . . . they were punching [him] in [his] face." Park stated the next thing he remembered was "[w]aking up in the hospital."

During cross-examination, Park was asked if he "ever put [defendant] in a head lock." Park answered, "No." He also denied starting the altercation, or "g[etting] in . . . Choi's face," stating, "they're the ones who attacked us," referring to defendant's group. Additionally, Park testified defendant and Choi "were kind of holding [him] so they could just hit [him] again."

13

Regarding his injuries, Park testified he "was in [the] ICU for . . . four weeks, but . . . was in [a] coma for three weeks." Thereafter, he was transferred to a rehabilitation center and eventually was able to use a wheelchair but could not "stand up or walk . . . for [thirteen] weeks." Further, Park testified he underwent multiple surgeries, including abdominal surgery and "orbital surgery," and was "still experiencing double vision," "facial numbness," "numbness in [his] belly," and "pain every single time [he] walk[ed]."

Defendant and Choi each testified Park and Baek initiated the physical altercation on July 21, 2019, by cursing at their group and physically moving toward them as Park and Baek urged defendant's group to leave the scene. Choi testified that when Park and Baek came out of the bar the second time, they "looked angry" and started toward him "with their fists rolled up." Choi also stated that Baek and Park "said they[ were] gonna kill [him]," so he "had to make a split-second decision" to defend himself. Choi testified he initially "attempted to punch the person closest to [him], which was Baek, but [he] didn't land a single punch." Choi stated he saw Park "grabbing [defendant] into a chokehold" and forcing defendant "onto the ground," so Choi tried "yanking" Park's arm "to get his arm off" defendant. Choi also testified that because Park "had a

14

complete . . . lock on [defendant]," Choi started punching Park's arm to free defendant.

On cross-examination, Choi admitted he threw the first punch of the fight. He also admitted to punching and kicking Park while he was on the ground.

Defendant testified that after Baek and Park initiated the altercation and "[t]he fight broke out," all of the men "ran toward the street." Defendant stated that as he started running "to protect [his] friend," he fell. He recalled that when he stood up, "Park got [him] in [a] choke[]hold and then [they both] fell [to] the ground." Further, defendant stated he "could not breathe" or speak until Choi helped him release Park's grip. Defendant then "could wiggle a little bit" and was able to "get out of the choke[]hold," but then "thought [his] life was at s[t]ake so [he] had to attack [Park]."

Defendant stated he "swung [at Park] . . . without looking" but he thought he punched Park in "his face, his shoulder, [and] his head." Defendant also testified that after he got back on his feet, he thought he kicked Park "near the back of his head" and "moved toward [Baek] where there was another fight." Defendant stated that before he, Choi, and Mo left the scene, Baek attacked him, Mo pushed Baek, and Choi "came to stop the fight." Further, defendant testified

15

that until he was arrested, he was unaware Park was hit by a vehicle during the incident.

When the State gave its closing argument, the assistant prosecutor described Park's injuries for the jury. At one point, she stated, "[t]his July is going to be three years since . . . defendants delivered their fists to . . . Park's face and . . . Park [now] has double vision." Defendant's attorney immediately objected, stating, "that's not the testimony." The judge overruled the objection. The assistant prosecutor continued, stating, "Park testified he has double vision from the right eye. He has numbness of his cheek. Remember that. Permanent . . . loss of the function of a bodily organ."

Next, in addressing defendant's offenses, and how they related to Park's injuries, the assistant prosecutor reminded jurors that Dr. Rippey opined Park's "face was punched several times." Regarding Dr. Benson's testimony, the assistant prosecutor noted he opined that "to cause the[] type of orbital fracture[ Park suffered], . . . '[y]ou must hit something that protrudes into the rim, [it] cannot be a fall on a flat . . . surface. [With a] fall on a flat surface, the rim will protect the thin bone underneath.'" Finally, the assistant prosecutor referred to both doctors, stating:

> These are fact witnesses . . . . These are witnesses that
> saw the . . . victim. They don't get paid. They said they

16

don't get paid. They have to come and testify because they're fact witnesses. They testify as to what happened in this case. They're not coming here to render an opinion about some other case that they have not seen.

Defendant's attorney again objected, but the judge overruled the objection, stating, "[i]t's [closing argument] . . . . It's a fair comment on the testimony."

The assistant prosecutor also reminded jurors that during the trial, defendant's attorney referred to Park being involved in a civil lawsuit. She stated, "there is absolutely no evidence in the case whatsoever about millions of dollars, and . . . Park winning [a lawsuit]. This is . . . not part of the case. . . . This is all [defendant's attorney's] invention." Defendant's attorney again objected and was overruled, at which point the assistant prosecutor added:

> You heard testimony that there [wa]s a lawsuit against . . . Rock 21, right? Did you hear anything else? Did you hear anything about millions of dollars? I didn't because I don't know anything about millions of dollars. So[,] . . . take [that] out of your head. Because . . . [i]t's not part of this case. . . . [I]t's not relevant to this case.

Before charging the jury, the judge explained the reason she overruled defendant's objection to the State's closing remark about there not being "millions of dollars at stake." Aware that defendant's attorney stated in closing "Park [wa]s suing everybody here" and "looking for real money," which was "probably the most reliable reason why . . . Park wouldn't have told the whole

truth," as "one stands to make millions," the judge found it was "not fair commentary on the evidence because there was no evidence of millions of dollars."

Thereafter, the judge charged the jury. When addressing the medical testimony provided by the State's witnesses, the judge instructed:

> Expert witnesses who testify are, of course, . . . paid for [their] work. Experts are paid for their special knowledge, skill, experience, or training. Some may be full-time employees who receive a regular salary for their work[,] and some may be outside experts consulted for this particular case who received a fixed or hourly fee. You may consider the compensation received by the expert witness as bearing on [their] credibility.
>
> You should understand, however, . . . there is nothing improper in any expert receiving reasonable compensation for [their] work or for . . . appearing in court. If you find, from the evidence, that the amount of compensation received is unreasonable, or . . . the expert was paid simply to reach a particular result, you may consider whether that affects the credibility, interest, or bias of the witness.

Hours after the jury was charged, it reached a verdict for each defendant. Once the jury returned to the courtroom, the judge asked the foreman whether the jury, in fact, reached a verdict. The foreman responded, "We have." Next, the judge asked if the verdict was unanimous. The foreman answered, "Yes." The foreman then advised the judge that the jury found Choi guilty of aggravated

18

assault and endangering an injured person, and that "the State disprove[d], beyond a reasonable doubt, that [Choi] acted in self-defense of himself and[/]or others."

Immediately thereafter, the foreman announced the jury also found "the State disprove[d], beyond a reasonable doubt, that . . . defendant acted in defense of himself and[/]or others" and that defendant was guilty of aggravated assault and endangering an injured person. After the foreman turned over the jury's verdict sheets, the judge ordered the jurors "polled as to [their] verdict" for each defendant, stating "[a]s your juror number is called, please answer ['']yes['] if the verdict reported by your foreperson is your verdict. Please answer ['']no['] if the verdict reported by your foreperson is not your verdict." The following colloquy occurred:

> THE CLERK: On State versus Suk Ban, do you agree or disagree with the verdict? Juror Number 2?
>
> JUROR NUMBER 2: Yes.
>
> THE CLERK: Juror Number 4?
>
> JUROR NUMBER 4: Yes.
>
> THE CLERK: Juror Number 5?
>
> JUROR NUMBER 5: Yes.

19

THE CLERK:  Juror Number 6?

JUROR NUMBER 6:  Yes.

THE CLERK:  Juror Number 9?

JUROR NUMBER 9:  Yes.

THE CLERK:  Juror Number 10?

JUROR NUMBER 10:  Yes.

THE CLERK:  Juror Number 11?

JUROR NUMBER 11:  Yes.

THE CLERK:  Juror Number 12?

JUROR NUMBER 12:  Yes.

The judge subsequently thanked and discharged the jury, stating, in part:

> With the return of a verdict, your service in this case is complete.  Upon your discharge, you are not required . . . to discuss your deliberations or your verdict with anyone.
>
> . . . [N]o attorney or party or person acting for them is permitted under the [R]ules of Court to examine or question you about this matter or your role in its outcome. . . .  You may also be contacted by others, including members of the media.  It will be up to each of you to decide whether to speak about your service as a juror. . . .
>
> All jurors have the prerogative to keep confidential their communications with their fellow jurors during deliberations.

20

After the jury exited the courtroom, the judge asked counsel if there was "anything else to go on the record before" she scheduled defendants' sentencing dates. Counsel offered no additional remarks at that point, and following a brief pause in the proceedings, the judge scheduled defendant and Choi for sentencing. She also granted the State's motion to revoke defendant's release and he was taken into custody.

Before concluding the proceedings, the judge again asked defense counsel if they had "anything else" to address with the court. In response, defendant's attorney advised the court about a motion for acquittal he prepared. Following a brief discussion about the motion, the judge ended the hearing.

Approximately an hour and a half later, the judge went back on the record and stated:

> After we discharged the jury, I had some concern about whether the poll was complete[,] and I listened back . . . and . . . found that it was not. At the time, [eight] jurors of the [twelve] deliberating jurors were polled. . . . My staff called back our [twelve] deliberating jurors. They are in the jury room. . . . My intention is to bring the . . . [twelve] deliberating jurors[] back into the courtroom, swear them [in,] and poll all [twelve of them] again.

21

A-3983-21

The judge asked if counsel wished to be heard. Counsel lodged no objection to the judge's proposal. Notably, defendant's attorney also told the judge, "I think you have to [po]ll the jurors, so I have no objection to that."

Once the jury re-entered the courtroom, without any objection from counsel, the judge apologized for her oversight, swore in the jurors, and proceeded to re-poll them on their verdicts for defendant and Choi. Regarding defendant's charges, she repeated the guilty verdicts reported by the foreman before asking each juror "if the verdict reported by [their] foreperson as contained in the verdict sheet [was their] verdict." Juror Numbers 2, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15 and 16 all answered, "Yes." The judge again thanked the jury for their service, told them they were discharged from service, and asked counsel before the jurors left if "anyone need[ed] to see [her] at sidebar before [she] discharge[d] the jury." The State and defense counsel individually confirmed they did not need a sidebar, and the judge released the jurors.

After the jury was dismissed, the judge again asked if counsel needed to be heard before the hearing concluded. Defendant's attorney responded:

> [DEFENSE COUNSEL]: Judge, . . . it's [six] o'clock. The jurors came back in, they swore to tell the truth. But they're not sworn in as jurors anymore. They were discharged from that obligation. And so . . . I think it's a mistrial. I don't think the court can ask a jury that[ was] discharged to return. I don't think they

22

can re[-]swear in juries. I don't think there's any precedent to . . . re[-]swear in juries after the discharge. And especially[] after they . . . spoke openly with who[m]ever they spoke.

Did [the jurors] call people? Did they talk to people? . . . I don't think that this is recoverable. I don't think they were sworn in again as jurors. I don't think the proper procedures were followed. I don't think the protocol was followed. And again, I'm applying for a mistrial.

THE [JUDGE]: . . . The deliberating jurors came in and they were sworn in to tell the truth. They did not engage in deliberations. I asked them, simply, whether or not the verdict reported was the[irs]. I hear your position. I decline to declare a mistrial.

In July 2022, the judge sentenced defendant to a five-year prison term on the aggravated assault charge, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2(c). She also imposed a consecutive three-year term on the endangering charge.

II.

On appeal, defendant raises the following arguments:

POINT I

DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT PRECLUDED TESTIMONY OF DEFENDANT'S SELF-DEFENSE EXPERT[,] BECAUSE KNOWLEDGE PERTAINING TO TYPES OF CHOKEHOLDS AND AGGRESSION

23

INDICATORS ARE BEYOND THE KEN OF THE
AVERAGE JUROR.

POINT II

DEFENDANT WAS DENIED THE RIGHT TO DUE
PROCESS AND A FAIR TRIAL WHEN THE STATE
PUBLISHED TO THE JURY A GRU[E]SOME
PHOTOGRAPH OF [PARK] WITH INJURIES
PREDOMINANTLY CAUSED BY A[N SUV].

POINT III

THE TRIAL COURT SHOULD HAVE
INTERVENED TO REMEDY THE TRANSLATION
ERROR BY EITHER ORDERING AN AUDIT OF
THE TRANSLATION OR PROVIDING AN
OPPORTUNITY FOR COUNSEL TO CORRECT
BAEK'S STATEMENT.

POINT IV

[THE] STATE COMMITTED PREJUDICIAL
MISCONDUCT DURING CLOSING ARGUMENTS
NECESSITATING A REVERSAL.

POINT V

THE TRIAL COURT COMMITTED A REVERSIBLE
ERROR BY REASSEMBLING THE JURORS AFTER
DISCHARGING THEM OF THEIR DUTIES
BECAUSE DURING THIS TIME THE JURY WAS
NO LONGER A FACT-FINDING ENTITY UNDER
THE CONTIN[U]OUS CONTROL AND
SUPERV[I]SION OF THE TRIAL COURT.

A-3983-21

We begin our analysis of the first two contentions by acknowledging that a trial court's evidentiary rulings "are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Singh, 245 N.J. 1, 12-13 (2021) (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)). We do not substitute our "judgment for that of the trial court, unless the trial court's [evidentiary] ruling was so wide of the mark that a manifest denial of justice resulted." Id. at 13 (quoting State v. Brown, 170 N.J. 138, 147 (2001)). However, an evidentiary decision is reviewed de novo if the trial court applies the wrong legal standard in deciding to admit or exclude evidence. State v. Trinidad, 241 N.J. 425, 448 (2020).

A determination on the admissibility of expert testimony also is committed to the sound discretion of the trial court. Townsend v. Pierre, 221 N.J. 36, 52 (2015). Generally, the admission of expert testimony is governed by N.J.R.E. 702, which provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To be admissible, the proposed expert testimony must satisfy three criteria: (1) "concern a subject matter that is beyond the ken of the average juror; (2) the

field testified to must be . . . state of the art such that an expert's testimony [is] sufficiently reliable; and (3) the witness must have [appropriate] expertise to offer the intended testimony." Jacobs v. Jersey Cent. Power & Light Co., 452 N.J. Super. 494, 504 (App. Div. 2017) (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 413 (1992)).

It also is well settled that relevant evidence may be excluded under N.J.R.E. 403 "if its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." Evidence is deemed unduly prejudicial "when its 'probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." State v. Koskovich, 168 N.J. 448, 486 (2001) (alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)). However, "[t]he mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Morton, 155 N.J. 383, 453-54 (1998).

Guided by these principles, we reject defendant's contention that the judge erred in precluding testimony from defendant's proposed self-defense expert, McComb, about the potential life-threatening effects of a chokehold Park

allegedly used against defendant, and how to identify indicia of aggression. Likewise, we are not persuaded the judge erred in allowing the State to use certain photos depicting the significant injuries Park sustained during the July 21, 2019 incident.

As the judge correctly noted, although McComb testified regarding Park's alleged "use of a potentially life-threatening rear choke[]hold on [defendant] and that [defendant] . . . employed self-defense and escape measures to become released from that," there was no evidence "from which [McComb could] draw the conclusion that this particular event was potentially life[] threatening." The judge also found "the only portion of [McComb's] testimony that m[ight] be relevant [wa]s the potential consequence[] of compression of an airway or an artery" caused by a chokehold, yet "McComb [wa]s not an expert in medical science." Thus, we are persuaded the judge correctly concluded McComb lacked the expertise "to opine regarding the potential consequences of that type of conduct." We also agree, for the reasons stated by the judge, that any testimony McComb provided about "aggression indicators," such as pushing a person or displaying clenched fists, would not be helpful to jurors because such conduct was "not outside the ken of the average individual."

A-3983-21

Next, we decline to conclude the judge erred in permitting the State to use certain photos showing Park's condition after the incident. As our Supreme Court has observed, photographs of a victim to a crime are likely to "cause some emotional stirring," State v. Johnson, 120 N.J. 263, 297 (1990) (quoting Thompson, 59 N.J. at 421), but "[t]he presence of blood and gruesome details [in photographs] are not ipso facto grounds for exclusion," Morton, 155 N.J. at 455-56 (quoting State v. DiFrisco, 137 N.J. 434, 500 (1994)). Photographs that are relevant on an issue in a case are admissible unless "their probative value is so significantly outweighed by their inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence." Thompson, 59 N.J. at 421 (emphasis added).

Mindful of these standards, we are persuaded the judge correctly admitted the photographs at issue. The judge found that because defendant and Choi were charged with second-degree aggravated assault, the State was required to demonstrate Park "suffered a serious bodily injury" that "was intentionally and knowingly caused" by defendants "or that . . . defendants . . . recklessly caused that injury." Therefore, she concluded "the injuries sustained by [Park] . . . [we]re clearly relevant" and the photos depicting his injuries also were "clearly

A-3983-21

relevant."  Moreover, she found "the issue . . . [wa]s one of actions and causation," and the jury would not be confused or misled by photographs of the injuries defendants were charged with inflicting.  Further, she determined the photographs were not unduly prejudicial because they related "to an ultimate issue" in the case.  She explained "[t]his [wa]s an assault case.  The photographs . . . of [Park] . . . [we]re not incredible" and were "not redundant."  These findings are amply supported by the record.  Therefore, the challenged evidentiary rulings do not require reversal of defendant's convictions.

Regarding Point III, defendant argues the judge should have remedied a translation error that allegedly occurred when Baek was shown certain video footage of the incident and asked if he "recall[ed] being angry . . . at any of the defendants at th[at] point."  This argument lacks merit.  R. 2:11-3(e)(1)(E).  Suffice it to say, the judge was under no obligation to accept the representations of defendant and Choi, as communicated through defendant's attorney, that the certified translator misinterpreted this portion of Baek's testimony.  We also note that although the judge was not persuaded a translation error occurred, she stated defendant's attorney "might need to . . . rephrase . . . [his] questions," given his concerns about the translation.  Defendant's attorney continued cross-examination without rephrasing the question triggering the disputed translation.

29

Under these circumstances and considering defendant's attorney acknowledged he did not "know how to correct" any purported translation mistake, we decline to conclude the judge's response to any purported translation error constituted harmful error.

Next, defendant argues the State committed prosecutorial misconduct during its closing argument, requiring reversal of his convictions. Again, we disagree.

The State, "within reasonable limitations, [is] afforded considerable leeway in making opening statements and [closing arguments]." State v. Gorthy, 226 N.J. 516, 539-40 (2016) (quoting State v. Wakefield, 190 N.J. 397, 443 (2007)). "While 'prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries[,]' . . . 'their comments [should be] reasonably related to the scope of the evidence presented.'" State v. Williams, 244 N.J. 592, 607 (2021) (second alteration in original) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). "[A]s long as the prosecutor 'stays within the evidence and the legitimate inferences therefrom,'" State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. R.B., 183 N.J. 308, 330 (2005)), "[t]here is no error," ibid. (alteration in original) (quoting State v. Carter, 91 N.J. 86, 125 (1982)).

"Generally, remarks by a prosecutor, made in response to remarks by opposing counsel, are harmless." State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993). Also, a prosecutor's "'fleeting and isolated' remark is not grounds for reversal." Gorthy, 226 N.J. at 540 (quoting State v. Watson, 224 N.J. Super. 354, 362, (App. Div. 1988)).

However, we may reverse a conviction due to prosecutorial misconduct when the conduct was clearly and unmistakably improper and "so egregious" that defendant was deprived of a fair trial. McNeil-Thomas, 238 N.J. at 275 (quoting Wakefield, 190 N.J. at 437). To warrant a new trial, there must be "some degree of possibility that [the prosecutor's comments] led to an unjust result." Id. at 276 (alteration in original) (quoting R.B., 183 N.J. at 330).

In reviewing a claim of prosecutorial misconduct, we consider whether: defense counsel raised "timely and proper objections"; "the offending remarks 'were withdrawn promptly'"; "the trial court struck the remarks and provided appropriate instructions to the jury"; and "the offending remarks were prompted by comments in the summation of defense counsel." State v. Smith, 212 N.J. 365, 403-04 (2012) (quoting Frost, 158 N.J. at 76). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." R.B., 183 N.J. at 333. An objection made immediately after summation is

31

considered timely because it affords the trial judge the opportunity to take curative action. See, e.g., State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997). Proper curative instructions generally remove the potential prejudice resulting from improper closing remarks. See Smith, 212 N.J. at 409.

Here, defendant contends the State's closing "remarks unfairly attacked [his] credibility." He argues one example of this was when the assistant prosecutor stated Park suffered from "double vision" after being punched in the face by defendants, yet "the [S]tate never submitted evidence that Park's double vision was caused by defendants' fists." This contention is belied by the record. In fact, Dr. Benson was asked on direct examination "[w]hat[,] if any[,] permanent consequences [we]re associated with . . . Park's injury." Dr. Benson answered that a patient who suffered "an orbital floor fracture" could "experience numbness in the cheek and the lip and gum," and he "ha[d] seen patients with permanent injury and permanent numbness to their face[s]." He also stated another "consequence of this type of injury [wa]s potential double vision" and he "kn[ew] that post[-]operatively[, Park] had complaints of visual blurriness and some double vision." Importantly, Dr. Benson also testified the injuries Park suffered to the right side of his face were consistent with "[b]lunt force trauma to the bone," and "[a] classic example" of a cause "for an orbital

blowout fracture is . . . having a blow to the eye, [with] a fist or . . . a bat." Moreover, Park testified he suffered from double vision following the incident. Therefore, we are satisfied the judge correctly found the assistant prosecutor's comments about Park's double vision constituted fair comment on the evidence adduced at trial.

Defendant also argues "[t]he [S]tate . . . attempted to bolster the credibility of its experts by describing them as 'fact witnesses' that . . . 'don't get paid' and '[t]hey [did] not com[e to court] to render an opinion about some other case that they have not seen.'" This argument fails.

Both Drs. Benson and Rippey evaluated and treated Park for injuries he sustained as a result of the bar fight. In fact, Dr. Benson testified he evaluated Park's injuries following the July 21, 2019 incident and performed "an orbital floor repair" to fix the orbital fracture Park suffered during the incident. Dr. Rippey, an acute care surgeon, also testified she "took care of" Park when he was brought to the medical center by ambulance on July 21, 2019. Because both doctors testified about treatment they provided to Park, the assistant prosecutor did not engage in misconduct by referencing this treatment during her summation.

Regarding the assistant prosecutor's comment that as fact witnesses, the

33

doctors did not "get paid," we are persuaded the judge correctly concluded this was "fair comment on the testimony," considering Dr. Rippey testified she thought she might receive a fee, but "ha[d not] received anything" and Dr. Benson evaluated Park as part of his duties at the medical center where Park was brought after the incident. The judge also properly explained to the jury during her charge that "expert witnesses who testify are . . . paid for [their] work" and "there is nothing improper in any expert [witness] receiving reasonable compensation for [their] work or for . . . appearing in court." Thus, the assistant prosecutor's comments about the doctors being fact witnesses, rendering treatment to Park, and not receiving compensation for their testimony provides no basis for reversal.

Defendant also newly argues the assistant prosecutor engaged in misconduct by stating in closing that defendants "create[ed] a narrative for [the jury] to believe" and jurors should not "believe it . . . . [b]ecause it [did not] make sense." Because defendant lodged no objection to this comment when it was made, we review the comment under the plain error standard, meaning we will not reverse on the ground of such error unless the error was "clearly capable of producing an unjust result." R. 2:10-2. The plain error standard aims to "provide[] a strong incentive for counsel to interpose a timely objection,

A-3983-21

enabling the trial court to forestall or correct a potential error." State v. Bueso, 225 N.J. 193, 203 (2016).

We discern no plain error here. Instead, we are persuaded the challenged comment was made in direct response to defendant's closing argument. See State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001) ("A prosecutor is permitted to respond to an argument raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial."). Further, the disputed comment by the State was tied to the evidence adduced at trial. And importantly, in the judge's final charge, she issued the standard instruction that "[a]rguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence." Model Jury Charge (Criminal), "Final Charge" (rev. Sept. 1, 2022). We presume the court's instructions were followed. State v. Vega-Larregui, 246 N.J. 94, 126 (2021). Therefore, even if we concluded it was error to permit the challenged comment, which we do not, we would find the error harmless. R. 2:10-2.

Similarly, we decline to conclude the assistant prosecutor improperly attacked defendant's credibility by telling jurors to disregard any reference his attorney made about Park benefitting from a civil lawsuit. As discussed, the assistant prosecutor stated, "there [was] absolutely no evidence in the case

whatsoever about millions of dollars, and . . . Park winning. This [was] not part of the case." The judge overruled defendant's objection to this remark, explaining she found it constituted "argument," and the State had not "overstep[ed]" its bounds. We perceive no error in this determination. Moreover, as we have mentioned, we presume jurors followed the judge's instruction not to treat arguments made by the attorneys as evidence. Thus, the challenged remarks provide no basis for reversal.

Finally, defendant argues the judge erred by reassembling the jury to re-poll jurors after realizing four jurors (i.e., jurors 13, 14, 15, and 16) were not initially questioned about whether their verdict matched what the foreman reported. He contends the re-polling was error "because the jurors left the courthouse, had an opportunity to mingle with third parties, and were specifically instructed that they were no longer sworn and under the supervision of the trial court." We are not convinced.

"[T]rial errors that were induced, encouraged[,] or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. A.R., 213 N.J. 542, 561-62 (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). On the other hand, when "a party preserves an issue for appeal on the record," we review the issue for "harmful error." See State v. Mohammed,

226 N.J. 71, 86 (2016). Under the harmful error standard, we determine "whether the error [wa]s 'clearly capable of producing an unjust result.'" Id. at 87 (quoting R. 2:10-2). An alleged error brought to the trial judge's attention will not be grounds for reversal if it was "harmless error." Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018); State v. J.R., 227 N.J. 393, 417 (2017).

We also recognize that "[o]nce a jury has been discharged and dispersed, it cannot be reassembled . . . to correct an omission in the verdict, including the failure to announce a portion of the verdict agreed upon but not reported." State v. Black, 380 N.J. Super. 581, 589 (App. Div. 2005) (citing State v. Fungone, 134 N.J. Super. 531, 536 (App. Div. 1975)). But we further note that "[a]lthough a poll of the jury is the right of the accused, it is not a necessary ingredient of [the accused's] conviction, but must be requested by timely request, and may be waived by a failure to make such request." State v. Vaszorich, 13 N.J. 99, 127, 98 (1953) (emphasis added); see also R. 1:8-10 ("the jury shall be polled at the request of any party").

Here, the judge asked defense counsel and the State if they wished to be heard after advising them she intended to call back the twelve deliberating jurors to ask each of them to confirm they agreed with the verdict reported by the foreperson. Neither defendant's attorney, Choi's attorney, nor the State objected

to the judge's proposal to reassemble the jury for this purpose. Instead, the State said it was "fine with that," Choi's attorney stated, "No objection," and defendant's attorney responded, "I think you have to call the jurors, so I have no objection to that." Under these circumstances, defendant's belated objection to the re-polling procedure provides no basis for reversal.

We also are satisfied this case is distinguishable from both Black and Fungone. In Black, "no verdict was returned on one of the charges" because "the jury had not placed any mark on the verdict sheet regarding [that] charge." Black, 380 N.J. Super. at 589, 591. And in Fungone, the jury found the defendant guilty of larceny, but "failed to report a finding" of the value of the stolen vehicle. Fungone, 134 N.J. Super. at 533. In both cases, the verdict was reversed because jurors were discharged and thus, could not be reassembled to correct the omissions in their verdict sheets. Black, 380 N.J. Super. at 589; Fungone, 134 N.J. Super. at 536.

But here, jurors were not reassembled to "correct" an omission in the verdict sheet. The verdict, as announced by the foreman, was that defendant was guilty on both charged counts. Inadvertently, however, the judge's clerk polled only eight of the twelve deliberating jurors to confirm their verdict was as stated. When the judge corrected the mistake, the jury's verdict remained the

A-3983-21

same. Also, as the judge aptly noted, when the jurors returned to her courtroom to address the oversight, "they . . . did not engage in deliberations." Rather, they were merely asked by the judge after they were sworn "whether or not the verdict reported was the[irs]." Accordingly, we are satisfied the judge committed no reversible error by reassembling the jurors to complete the polling process.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3983-21